## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NORTHEASTERN UNIVERSITY,

                        Petitioner,

   v.

SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL 509,

                   Respondent.

Civil Action No.: _____

## **COMPLAINT AND PETITION TO VACATE ARBITRATION AWARD**

Petitioner Northeastern University ("Northeastern" or "the University") brings this action to vacate an arbitration award pursuant to a collective bargaining agreement ("Agreement") with Respondent Service Employees International Union, Local 509 ("Local 509" or the "Union"). The parties' Agreement contained a broad management rights provision which made clear that the University "exercise[d] sole authority on all decisions involving academic matters." As the arbitrator here acknowledged, "[h]ow a course is classified is an academic matter reserved to the University."

After recognizing this broad reservation of authority over course classification, the arbitrator then disregarded the University's determination that a course available to foreign language students should not be classified as a "content course." In doing so, the arbitrator exceeded his authority under the Agreement and disregarded the clear language of the Agreement. According to the arbitrator, the Agreement did not define the term "content course," so he devised his own definition. However, this usurped the University's academic judgment under the management rights clause of the Agreement which – as explicitly found by the arbitrator -- vested

the University with the sole authority to determine how a course is classified.  The arbitrator inappropriately substituted his own views for the reserved academic judgment of Northeastern.

1.      This Petition is brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to vacate the arbitrator's Award and Opinion of Robert M. O'Brien ("the arbitrator") dated March 30, 2020, a true and accurate copy of which is attached as **Exhibit 1**.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 185. Venue is proper under 29 U.S.C. § 185 and 28 U.S.C. § 1391.

### Facts

2.      Northeastern is a global, experiential research institution of higher education.  The University educates undergraduate and graduate students at nine colleges and schools, one of which is the College of Professional Studies ("CPS").

3.      The University maintains a campus located at 360 Huntington Avenue, Boston, Massachusetts and at 89 Broad Street, Boston, Massachusetts.  Collectively, these are referred to as the "Boston Campuses."

4.      The Union is an unincorporated association and a "labor organization" as defined by 29 U.S.C. § 152(5).  The Union is headquartered at 293 Boston Post Road West, 4th Floor, Marlborough, Massachusetts.

5.      Since 2014, the Union has been the exclusive bargaining representative of part-time graduate and undergraduate faculty at the University's Boston Campuses, as described in the Agreement's recognition clause.

6.      The University and the Union were parties to the Agreement for the dates in question, February 26, 2016 through June 30, 2019.  A copy of the Agreement is attached as **Exhibit 2**.

7.      Article 2 of the Agreement, entitled Management Rights, states as follows:

Section 1.  The Union recognizes the right of the University to operate and manage the University.     All rights, functions, prerogatives and discretions of the management of the University formerly exercised by the University are retained by and remain vested exclusively in the University, except to the extent that such rights, functions, prerogatives and discretions are specifically and explicitly modified by the express provisions of this Agreement.  No such right, function, prerogative, or discretion shall be deemed waived or modified, unless the waiver or modification is in writing and signed by the University and the Union.  Without limiting the generality of the foregoing, the University reserves the right to:

a.  plan, determine, modify, direct and control the University's mission, programs, objectives, activities, resources, and priorities;
b.  determine, install, introduce, modify, remove, discontinue or end any method, procedure, policy, material, equipment, and operation used or to be used by employees;
c.  direct and control operations;
…
x.  exercise sole authority on all decisions involving academic matters, including but not limited to establishing or changing curriculum, establishing or changing standard syllabi for courses with multiple sections and establishing uniform grading rubrics and student performance standards;
…
z.  establish, change, modify and cancel courses;
….

Section 3.  Should a specific provision of this Agreement directly conflict with, modify or restrict an enumerated right under this Article, the specific provision of the Agreement shall prevail over the enumerated right.

Section 4.  The University, in not exercising any function hereby reserved to it in this Article 2 -- Management Rights or in exercising any such function in a particular way, will not be deemed to have waived its right to exercise such function or preclude the University from exercising the same in some other way.

Section 5.  No action taken by the University with respect to a management or academic right shall be subject to the grievance procedure or collateral suit unless the exercise thereof violates an express written provision of this Agreement.

8.      The Agreement contains a grievance and arbitration provision.  Article 7, Section 1 states that "[a] grievance within the meaning of this Agreement shall be any complaint or dispute arising out of the application or interpretation of a specific provision of this Agreement."

63579653v.1

9.      The grievance process provides various steps, culminating in arbitration before an arbitrator.  Article 7, Section 5(b) of the Agreement limits the authority of the arbitrator:

> The arbitrator shall have no authority to add to, subtract from, alter or amend any of the provisions of this Agreement.  The arbitrator shall have the authority only to decide disputes concerning the interpretation and application of the specific section(s) and article(s) of the Agreement to the facts of the particular grievance presented to him or her.  If the arbitrator finds that the University acted in accordance with its rights under Article 2 -- Management Rights which are not further abridged by other terms of this Agreement, the arbitrator shall have no jurisdiction or authority to issue any award changing, modifying or restricting any such action taken by the University.

10.      Article 12 of the Agreement relates to compensation.  Article 12 states that "[t]he minimum pay rates for teaching courses are set forth in Appendices A and B."  Appendix B sets forth the compensation to be paid to part-time faculty in the CPS.

11.      As found by the arbitrator, CPS offers a program called the Global Pathways/ American Classroom ("GPAC").  The goal of the GPAC program is to assist non-English speaking students in improving their English language skills, such as reading English, speaking English, and English vocabulary, and to help them gain entry to a degree program at the University at either the graduate or undergraduate level.  Students who successfully complete the GPAC program are given automatic admission to an academic program at the University.  The GPAC program does not confer any degrees and most courses in the program do not count as academic credit to any degree program.

12.      Appendix B sets out the per course flat pay rates for GPAC courses.  Below is an extract from Appendix B showing rates for GPAC courses during the period July 1, 2018 - June 30, 2019.

| | | Per Course Flat Rates |
|---|---|---|
| Department | Description | July 1, 2018 - June 30, 2019 |
| Global Pathways | Global Pathways / AC 1 hour section | $1,212 |
| Global Pathways | Global Pathways / AC 3 hour section | $4,300 |
| Global Pathways | Global Pathways / AC 6 hour section | $6,600 |
| Global Pathways | Global Pathways / AC 7 hour section** | $7,400 |
| Global Pathways | Global Pathways / AC 8 hour section | $10,201 |
| GPAC (except Global Experience) | Content Courses (course rate) | $6,400 |
| GPAC (except Global Experience) | Content courses (1 CH) | $2,860 |
| GPAC (community learning) | Community Learning | $1,600 |

** Limited to the following courses: ESLG 0610, ESLG 0055, ESLG 0234, ESLG 0232, ESLG 0550.

13.     Thus, under the Agreement, a three-hour section for a GPAC course had a flat rate of $4,300 per course, while a "content course" within GPAC has a $6,400 flat rate.  The Agreement does not define the term "content course."

14.     In the summer of 2018, CPS developed a new course for the GPAC program, entitled *Managing in a Diverse and Changing World*.  The course was given the code ESLG 0238. "ESLG" preceding the course number refers to "English as a Second Language."

15.     ESLG 0238 was a three credit hour course, and the University determined that those credits could not transfer to a degree program.  As the arbitrator confirmed, "[w]hether course credits are transferred to a degree-granting program is an academic matter within the sole discretion of the University."

5

16.     The University determined that ESLG 0238 was not a "content course" and, as a result, it paid the flat rate of $4,300 in Appendix B for the three-credit course.

17.     On August 28, 2018, the Union filed a grievance on behalf of the part-time faculty who taught ESLG 0238, alleging that the GPAC "content course" rate should apply.  The parties were unable to resolve the grievance during the grievance steps, and the Union demanded arbitration of the grievance.

18.     An arbitrator was selected, and the arbitrator held a hearing on November 18, 2019 and January 14, 2020.

19.     The University argued that the grievance was not substantively arbitrable in accordance with Section 5 of Article 2 of the Agreement, and that the grievance should be denied on the merits.

20.     On March 30, 2020, the arbitrator issued his award.

21.     The arbitrator found the grievance to be substantively arbitrable because the Union's grievance alleged a violation of Article 12 and Appendix B.  However, the arbitrator acknowledged that "[h]ow a course is classified is an academic matter reserved to the University."

22.     Despite recognizing that course classification is a management right, the arbitrator went on to conclude that ESLG 0238 should be considered a "content course."

23.     The University explained that it classified courses within the GPAC program as "content courses" only if the credits were transferable to a degree-granting program.  The arbitrator ignored that contention based upon his finding that nothing in the Agreement states that a "content course" is one where the credits were transferable.

24.     In claiming that the Agreement's absence of a "content course" definition undermined the University's determination that ESLG 0238 was not a "content course," the

6

arbitrator ignored and effectively upended the language of the Management Rights article of the Agreement that reserved course classification to the University's academic judgment.

25.     Further, in concluding that ESLG 0238 was a "content course," the arbitrator substituted his judgment for that of the University.  Although the arbitrator recognized that the purpose of the GPAC program was to help non-English speaking students develop English language skills, he nonetheless believed that unless a course in the GPAC program specifically focuses on learning English, it is a "content course."  No such dichotomy can be found in the Agreement.  Based on this false dichotomy, the arbitrator determined that ESLG 0238 was not an English language course and therefore must be classified as a "content course."

26.     In creating his own definition for what is a "content course," the arbitrator exceeded his authority under the Agreement, since he had "no authority to add" to the language of the Agreement or to restrict or substitute his judgment for the University's exercise of its Management Rights.

## Grounds To Vacate The Award

27.     Paragraphs 1 through 26 are incorporated by reference as if fully set forth herein.

28.     The Award does not draw its essence from the Agreement.

29.     In issuing the Award, the arbitrator exceeded his authority and dispensed his own brand of industrial justice.

## Prayer for Relief

WHEREFORE, Petitioner prays for relief against Respondent as follows:

1.     An order vacating the arbitrator's decision; and

2.     Any further relief as the Court deems just and proper.

Dated: April 29, 2020

Respectfully Submitted,

PETITIONER NORTHEASTERN UNIVERSITY

By its counsel:

/s/ Robert A. Fisher
Robert A. Fisher (BBO # 643797)
Timothy J. Buckley (BBO # 691200)
rfisher@seyfarth.com
tbuckley@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:  (617) 946-4800
Facsimile:   (617) 946-4801