UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NORTHEASTERN UNIVERSITY, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil No. 20-10825-LTS |
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 509, | ) ) ) ) | |
| Respondent. | ) ) ) | |

<u>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 19, 22)</u>

May 24, 2021

SOROKIN, J.

Northeastern University seeks a judgment vacating an arbitration award rendered March 30, 2020, requiring it to pay certain adjunct instructors $2,100, combined, based on the arbitrator's interpretation of a collective bargaining agreement ("CBA") between Northeastern and Service Employees International Union, Local 509 ("SEIU").  Doc. No. 19.[1]  SEIU opposes Northeastern's request, asks the Court to confirm the arbitration award, and seeks an order requiring Northeastern to pay interest accruing from the date of the award.  Doc. No. 22.  After a hearing, and for the reasons that follow, Northeastern's motion is DENIED, and SEIU's motion is ALLOWED in part and DENIED in part.

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

I.   BACKGROUND[2]

Northeastern educates students in undergraduate and graduate programs at nine different colleges and schools.  Two of Northeastern's campuses are located in Boston.  In 2014, SEIU became the exclusive bargaining representative of part-time faculty at Northeastern's Boston campuses.  The relevant CBA between Northeastern and SEIU covered a period from February 2016 through June 2019.  Article 2 of the CBA delineates the rights of Northeastern, or "Management," providing in pertinent part:

> **Section 1.** The Union recognizes the right of the University to operate and manage the University. All rights, functions, prerogatives and discretions of the management of the University formerly exercised by the University are retained by and remain vested exclusively in the University, except to the extent that such rights, functions, prerogatives and discretions are specifically and explicitly modified by the express provisions of this Agreement. No such right, function, prerogative, or discretion shall be deemed waived or modified, unless the waiver or modification is in writing and signed by the University and the Union. Without limiting the generality of the foregoing, the University reserves the right to:
>
> a. plan, determine, modify, direct and control the University's mission, programs, objectives, activities, resources, and priorities;
>
> \*     \*     \*
>
> e. determine, increase, decrease or otherwise change the number, qualifications, scheduling, course load, hours, location, classification, responsibilities and assignment of employees;
>
> \*     \*     \*
>
> x. exercise sole authority on all decisions involving academic matters, including but not limited to establishing or changing curriculum, establishing or changing standard syllabi for courses with multiple sections and establishing uniform grading rubrics and student performance standards;
>
> \*     \*     \*

---

[2] The facts recounted here are derived from the parties' Consolidated Statement of Undisputed Material Facts, Doc. No. 24, the CBA, Doc. No. 1-2, and the arbitrator's decision and award, Doc. No. 1-1.

> z. establish, change, modify and cancel courses, including but not limited to converting a course to a directed study and canceling one or more sections of a particular course . . . .
>
> \*     \*     \*
>
> **Section 3.** Should a specific provision of this Agreement directly conflict with, modify or restrict an enumerated right under this Article, the specific provision of the Agreement shall prevail over the enumerated right.
>
> \*     \*     \*
>
> **Section 5.** No action taken by the University with respect to a management or academic right shall be subject to the grievance procedure or collateral suit unless the exercise thereof violates an express written provision of this Agreement.

Doc. No. 1-2 at 4-7.

In Article 7, Section 1, the CBA defines a "grievance" as "any complaint or dispute arising out of the application or interpretation of a specific provision of this Agreement." Id. at 11. With one exception not relevant here, the grievance and arbitration procedure described in Article 7 is "the sole and exclusive means for enforcing the terms of" the CBA. Id. Section 5 of Article 7 specifies that, though the arbitrator may not "add to, subtract from, alter or amend any of the provisions of the" CBA, they "shall have the authority . . . to decide disputes concerning the interpretation and application of the specific section(s) and article(s) . . . to the facts of the particular grievance presented." Id. at 13. The section goes on to state: "If the arbitrator finds that the University acted in accordance with its rights under Article 2 – Management Rights which are not further abridged by other terms of this Agreement, the arbitrator shall have no jurisdiction or authority to issue any award changing, modifying or restricting any such action taken by the University." Id.

Article 12 states that two appendices to the CBA set "[t]he minimum pay rates for teaching courses." Id. at 21.

3

The student body at Northeastern includes many individuals who are foreign born and are not native English speakers. To assist such individuals with improving their English language skills, Northeastern's College of Professional Studies ("CPS") offers a program called Global Pathways/American Classroom ("GPAC"). The GPAC program confers no degree, but a student who completes it is automatically admitted to an academic program at Northeastern. Most GPAC courses do not provide academic credits that are transferrable to a degree program, though some do. GPAC courses generally fall into one of two categories: English-as-a-second-language ("ESL") courses, and "content courses."

Appendix B to the CBA contains two pages of charts providing the level of compensation faculty within the SEIU bargaining unit receive for courses taught in Northeastern's CPS. The first page lists rates for CPS courses generally based on department and a description of the adjunct instructor's status or classification. See Doc. No. 1-2 at 28 (assigning rates based on descriptions such as "lecturer," "senior lecturer," "teaching assistant," and "thesis advisor"). The second page contains a chart listing compensation rates for faculty teaching courses in the GPAC program.[3] That chart identifies flat rates for eight categories of GPAC courses in each of the three academic years covered by the CBA. As relevant here, from July 2018 through June 2019, a three-hour section GPAC course (described as "Global Pathways/AC 3 hour section" on the chart) had a flat rate of $4,300, and a GPAC content course (described as "Content courses (Course rate)" on the chart) had a flat rate of $6,400. Id. at 29. The dispute in this case revolves

---

[3] The last two lines on this chart pertain to courses in a department designated "USPP." Neither the arbitrator nor the parties have referenced that program, which presumably is separate from GPAC. The Court notes here that the USPP entries, like those on the first page of Appendix B, assign rates based on department and a description of the adjunct faculty member's status (specifically, whether the instructor has a Master's Degree or Ph.D.). Doc. No. 1-2 at 29.

around which of these two rates was owed to faculty teaching a specific GPAC course in the fall of 2018, the first semester in which the course was offered.

The new course, called "Managing in a Diverse and Changing World," was developed by the GPAC program's Director of Faculty and Instruction in collaboration with four part-time lecturers and a professor from Northeastern's McKim Business School.  The course met three times per week in the fall of 2018, its students earned three credits, and Northeastern assigned it the course number ESLG0238.  Credits earned by students in this course were not transferrable to any degree program.

Northeastern compensated the instructors of the course $4,300—the flat rate for a three-hour section GPAC course.  One of the adjunct lecturers complained to the GPAC Director after he "signed a contract to teach" the course when "he realized that the compensation was $4300," explaining he believed the course should have been compensated at the flat rate for content courses.  Doc. No. 1-1 at 7.  According to the arbitrator, the GPAC Director "tacitly agreed" that the higher rate should have applied, and he brought the lecturer's concern to the attention of a Dean.  Id.  The Dean demurred, telling the Director that Northeastern had approved the course as an ESL course, not a content course.

In August 2018, SEIU filed a grievance on behalf of the ESLG0238 lecturers, alleging Northeastern had violated the compensation provisions of the CBA by refusing to pay the lecturers the flat rate for a content course.  Northeastern denied the grievance, asserting course classification was an academic determination reserved to it under the CBA and not subject to arbitration.  SEIU demanded arbitration, and an arbitrator presided over a hearing that began on November 18, 2019, then resumed and concluded on January 14, 2020.  In a March 30, 2020 award, the arbitrator concluded that SEIU's grievance was substantively arbitrable, that

Northeastern had violated the CBA, and that the adjunct instructors who taught the relevant course were entitled to the difference between the amount they were compensated and the flat rate due for content courses.

Dissatisfied, Northeastern petitioned this Court to vacate the arbitrator's award. According to Northeastern, the arbitrator disregarded the plain language of the CBA in finding the dispute substantively arbitrable, then "compounded that error by deciding whether ESLG0238 was a content course."  Doc. No. 20 at 10.  Based on these arguments, Northeastern seeks summary judgment.  Doc. No. 19.  SEIU opposes, has cross-moved for summary judgment and an order confirming the arbitrator's award, and seeks interest on the amount owed to the instructors of ESLG0238.  Doc. No. 22.  The motions are fully briefed, and the Court heard oral argument on May 13, 2021.  Doc. No. 27.

II.     LEGAL STANDARD

Northeastern's petition in this Court is filed pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Doc. No. 1 ¶ 1.  When asked to review an arbitration award by a party invoking that statute, a federal court applies "one of the narrowest standards of judicial review in all of American jurisprudence."  UMass Mem'l Med. Ctr., Inc. v. United Food & Commercial Workers Union, 527 F.3d 1, 4 (1st Cir. 2008).[4]  A court will "set aside an arbitration award" only "if it cannot discern, within the four corners of the" relevant contract, "any plausible basis for the arbitrator's interpretation."  Nat'l Ass'n of Gov't Emps., Inc. v. Nat'l Emergency Med. Servs. Ass'n, Inc., 84 F. Supp. 3d 43, 49 (D. Mass. 2015).  "[A]s long as an honest arbitrator is even arguably construing or applying the contract and acting

---

[4] All internal quotation marks have been omitted, and all emphases supplied, unless otherwise noted.

6

within the scope of his authority," a reviewing court's belief that "he committed serious error does not suffice to overturn his decision." E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000).  This exceptionally deferential standard renders arbitration awards "nearly impervious to judicial oversight." Teamsters Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000).

Though Northeastern correctly observes a federal court's "tightly circumscribed" authority to disturb an arbitration award does not render such an award "utterly impregnable," Doc. No. 20 at 10, the "few exceptions to the general rule that arbitrators have the last word" are "very narrow." Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 32-33 (1st Cir. 2006). The exceptions relevant here are triggered only "in those rare cases" where "an award contravenes the plain language of the applicable contract," or where "it is clear from the record that the arbitrator[] cavalierly disregarded applicable law," such as by exceeding the scope of his authority.  Id. at 33.  Northeastern believes this is such a case.  After careful review, the Court disagrees.

III.   DISCUSSION

Northeastern advances two challenges to the arbitrator's award.  First, it argues the arbitrator disregarded provisions of Article 2 of the CBA when he found SEIU's grievance was substantively arbitrable.  Here, as it did in arbitration, Northeastern characterizes the dispute as one involving the appropriate classification of ESLG0238 in the fall of 2018.  Doc. No. 20 at 11-12; accord Doc. No. 1-1 at 8.  It goes on to urge that "course classification" is always an academic matter within the sole discretion of Northeastern pursuant to Article 2 of the CBA, and

that the dispute about whether adjunct faculty teaching ESLG0238 were entitled to compensation at the "content course" rate is beyond the scope of authority granted to the arbitrator by the CBA.

In finding the dispute was substantively arbitrable, the arbitrator reasoned as follows:

> To this Arbitrator, the grievance involves how adjunct instructors were <u>compensated</u> for teaching *Managing in a Diverse and Changing World* in the 2018 fall semester. This is a complaint or dispute arising out of the application or interpretation of Article 12 and Appendix B of the [CBA].
>
> Article 7, <u>Section 1</u>, of the [CBA] defines a grievance as "*any complaint or dispute arising out of the application or interpretation of a specific provision of this Agreement.*" As observed above, the Union's grievance alleges a violation of two specific provisions of the Agreement, Article 12 and Appendix B. Therefore, it is a grievance under the [CBA] and is substantively arbitrable.
>
> How a course is classified is an academic matter reserved to the University. How adjunct instructors are compensated for teaching courses is a contractual matter that is subject to the grievance and arbitration provisions of the [CBA] and is therefore substantively arbitrable.

Doc. No. 1-1 at 8-9 (italics in original).

According to Northeastern, the plain language of the CBA required the arbitrator to conclude his analysis immediately upon noting that a course's classification "is an academic matter reserved to the University." Doc. No. 20 at 11; <u>see</u> Doc. No. 1-2 at 7 (placing actions taken with respect to academic rights beyond the reach of the grievance process). However, the Court finds this comment within the arbitrator's analysis does not transform his finding of substantive arbitrability into serious error, let alone justify the unusual step of disturbing the arbitrator's award, in the circumstances presented. <u>See</u> <u>UMass Mem'l Med. Ctr.</u>, 527 F.3d at 5 ("It is the arbitrator's result, after all, not his reasoning, which is subject to judicial review.").

Indeed, evaluation of the substantive arbitrability determination is straightforward. The arbitrator's characterization of the grievance presented to him as one involving a dispute as to proper compensation—and not a dispute about the academic classification of a course—is not

only plausible, but altogether reasonable.[5]  And, the arbitrator was not wrong in finding that resolution of the grievance required him to consider and interpret Article 12 and Appendix B to the CBA—the two portions of the contract expressly governing compensation.  Resolving disputes about "the interpretation and application of" specific provisions of the CBA "to the facts of [a] particular grievance presented to him" is squarely within the arbitrator's authority, as defined by the CBA itself.  Doc. No. 1-2 at 13; accord id. at 11 (Article 7, Section 1).  In other words, the parties to the CBA empowered the arbitrator to answer questions about the payment of adjunct faculty under the terms of the CBA governing compensation.  Even Northeastern does not seriously dispute the arbitrator's authority, as a general matter, to consider grievances arising from claims by SEIU that Article 12 and the compensation Appendices entitled adjunct faculty to greater pay than they received.  The arbitrator's finding that this grievance presented such a question, and that he could entertain it, in no way breached Northeastern's academic rights under Article 2, nor did it contravene any other language in the CBA.

The cases Northeastern cites in support of its challenge to arbitrability are meaningfully different from the situation presented here.  In all three cases upon which Northeastern most

---

[5] Northeastern accuses the arbitrator of "creat[ing] a [false] dichotomy between how a course is classified versus how it is compensated."  Doc. No. 20 at 7; Doc. No. 1 ¶ 25.  But no language in the CBA renders implausible the arbitrator's distinction between course classification and application of the compensation chart in Appendix B.  The compensation chart lists rates of pay based on "department" and "description."  Doc. No. 1-2 at 29.  It does not cite a course's "classification."  The CBA uses the term "classification" only in describing the status of an employee, not a course.  See Doc. No. 1-2 at 5, 6 (regarding management rights to control "classification . . . of employees" and to make changes to "any job classification").  Thus, the arbitrator plausibly could have interpreted Appendix B to the CBA as setting rates of compensation apart from academic course classification.  For example, the academic classification of a course might mean the determination of which department or program houses the course or whether credit hours are applicable or transferrable to a particular degree program.  These sorts of "classification" could reasonably be viewed as academic and separate from the question of which description applies to a course for purposes of Appendix B.

heavily relies, the arbitrators either disregarded unambiguous contract provisions or exceeded their authority by flagrantly adding to or changing the plain language of the relevant contracts. See Poland Spring Corp. v. United Food & Commercial Workers Int'l Union, 314 F.3d 29 (1st Cir. 2002) (vacating award where arbitrator found employee had been insubordinate and had no affirmative defense, acknowledged contract said insubordination "shall" be just cause for termination, but nevertheless found the employee entitled to lesser discipline due to mitigating factors referenced nowhere in the contract); Ga.-Pac. Corp. v. Local 27, United Paperworkers Int'l Union, 864 F.2d 940 (1st Cir. 1988) (vacating award where arbitrator found employee had lied to employer about an injury, acknowledged contract unambiguously said dishonesty was cause for discharge and did not permit reduction in discipline due to mitigating facts, but nevertheless found employment record should have caused employer to impose lesser penalty); see also Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union, 946 F.3d 195 (3d Cir. 2019) (vacating award where arbitrator found employer should have granted employee's vacation request despite unambiguous contract provision saying final right to approve vacation requests was "exclusively" reserved to employer).  Here, neither the arbitrator's own findings nor the plain language of the CBA precluded the arbitrator from reaching the merits of the parties' dispute about the meaning and application of the relevant compensation provisions.

Northeastern next challenges the arbitrator's interpretation of the CBA's compensation terms, urging the plain language of the CBA compelled the arbitrator to apply Northeastern's definition of "content course."  The CBA required no such thing.  As Northeastern concedes:

> The Agreement was silent as to what qualifies as an ESL course versus a content course.  It did not define either of those terms, let alone make any distinction between them.  Indeed, Appendix B . . . did not delineate between ESL courses and

      content courses at all. Rather, it referred to GPAC courses by credit hour and content courses.

Doc. No. 20 at 13. In the face of such silence—and the absence of a provision defining "content course," a term without an obvious and commonly understood meaning—the arbitrator acted within the bounds of his authority when he interpreted the relevant language in Appendix B. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37-38 (1987) (noting "decided preference" for resolving "labor disputes without the intervention of government" and that where parties "authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract").

      Nothing in the CBA grants Northeastern the exclusive power to dictate which compensation category applied to a course or otherwise suggests that the categorization of a GPAC course for purposes of Appendix B is a purely academic matter. Cf. Doc. No. 1-2 at 4-5 (reserving to Northeastern academic rights it "formerly exercised" only if those rights are not modified by other specific provisions of the CBA, such as Appendix B). Nor does the CBA contain language memorializing an agreement by the parties to Northeastern's preferred definition of "content course" as a GPAC course with credits transferrable to a degree program. Therefore, the arbitrator appropriately endeavored to interpret the relevant portions of Appendix B by considering the CBA as a whole and the evidence before him—including evidence that the parties discussed, but did not agree to, Northeastern's definition of "content course" during the bargaining process.[6] The arbitrator's determination that GPAC courses fell into two categories—content and non-content courses, with the latter primarily focused on improving

---

[6] This is not to say the arbitrator was free to entirely disregard the definition urged by Northeastern. The Court does not read his decision as reflecting a refusal to consider Northeastern's position. Even if he had so refused, the Court's assessment that his result (if not every aspect of his reasoning) draws its essence from the CBA would remain unchanged.

11

students' English language skills and the former primarily focused on other subject matter, such as business—and that ESLG0238 fell into the latter category, drew its essence from the CBA and was plausible in light of the evidence offered by the parties.[7]

Considered through the exceedingly deferential lens that this Court is bound to apply, the arbitrator's determination is neither implausible nor foreclosed by the plain language of the CBA.[8] Accordingly, Northeastern's attempt to undo the arbitrator's award must fail.

Only one issue remains. SEIU seeks an order requiring Northeastern "to pay interest on the back pay the instructors are owed from the date that the Award issued." Doc. No. 22 at 16. Though it is "within the equitable power and discretion of the Court" to enter such an order, Burke Distrib. Corp. v. Prof'l Salesmen's Union, No. 84-cv-3246-N, 1986 WL 10332, at *2 (D. Mass. Sept. 10, 1986), the Court declines to do so here. The arbitrator did not include interest in his award. Northeastern's petition for review of the award was not frivolous or filed in bad faith. And, the underpayment to the affected adjunct faculty members was neither substantial nor compounded by the pursuit of this appeal. Thus, the request for interest is DENIED.

IV.   CONCLUSION

In sum, the arbitrator considered all relevant provisions of the CBA and appropriately construed language that was reasonably susceptible to multiple interpretations. Though this

---

[7] In explaining his view of these categories and his conclusion about the relevant course, the arbitrator cited evidence including the syllabus approved by Northeastern, the specializations and experience of the instructors, and the textbooks and assignments. Doc. No. 1-1 at 6, 9-11.

[8] In so concluding, the Court does not suggest that the interpretation urged by SEIU and adopted by the arbitrator is the only reasonable application of Appendix B to the circumstances presented here, or that it is preferable to the definition of "content course" urged by Northeastern. The Court further emphasizes that it has limited its review of Appendix B to those GPAC categories identified by the parties as the relevant alternatives here. No other listings on the chart in Appendix B are at issue here, nor does this case require the Court to consider whether and how Northeastern's classification of an adjunct faculty member (e.g., as a senior lecturer or a teaching assistant) would impact the interpretation of another description or category in Appendix B.

might be viewed as a close case in some respects, it plainly is not one in which the arbitrator "cavalierly disregarded" the language of the CBA or the appropriate scope of his authority. Accordingly, Northeastern's motion for summary judgment (Doc. No. 19) is DENIED, and SEIU's cross-motion for summary judgment (Doc. No. 22) is ALLOWED insofar as it seeks an order confirming the arbitrator's award.  SEIU's request for post-award interest is DENIED for the reasons explained above.  A separate judgment will issue.

                                SO ORDERED.

                                 /s/ Leo T. Sorokin
                                United States District Judge